# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    No. CR 15-4268 JB

BENJAMIN CLARK, a.k.a. "Cyclone,"

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Formal Objections to Presentence Report, filed August 22, 2019 (Doc. 2817)("First Objections"); and (ii) the Second Notice of Formal Objections to Presentence Report, filed August 24, 2019 (Doc. 2825)("Second Objections"). The primary issues are: (i) whether, under § 3A1.1(b)(1) of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G."),[1] the 2-level

---

[1]The Supreme Court of the United States held in <u>Peugh v. United States</u>, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549. The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Defendant Benjamin Clark murdered Freddie Sanchez on June 17, 2007, <u>see</u> Second Superseding Indictment at 10-11, filed March 9, 2017 (Doc. 947), so the 2006 Guidelines Manual, effective November 1, 2006, would apply to the offense if the Court does not use the current Guidelines Manual, <u>see</u> U.S.S.G. § 1B1.11(b)(3). Using the 2006 Guidelines

enhancement for a vulnerable victim applies, because Defendant Benjamin Clark knew or should have known that the victim, Freddie Sanchez,[2] was particularly susceptible to being killed in light of the outstanding hit or "green light" calling for Sanchez' death, and Sanchez' incarceration with Syndicato de Nuevo Mexico ("SNM") members ordered to act on the green light; and (ii) whether a 2-level enhancement under U.S.S.G. § 3B1.1(c) for an aggravating role is appropriate, because Clark was a SNM leader. The Court concludes that: (i) the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1) is appropriate, because Clark knew or should have known that Sanchez was a vulnerable victim because of the green light on him and his incarceration with SNM members ordered to kill him; and (ii) the 4-level enhancement under U.S.S.G. § 3B1.1(a) is more appropriate than the 2-level enhancement under U.S.S.G. § 3B1.1(c), which the United States Probation Office ("USPO") applies, because Clark "was the 'main enforcer' for the SNM at" Southern New Mexico Correctional Facility ("Southern New Mexico"), Plea Agreement at 4, filed November 15, 2016 (Doc. 768), and because Clark was the leader of criminal activity involving at least five participants. Accordingly, the Court overrules the Objections.

On November 15, 2016, Clark pled guilty to Count 3, Sanchez' murder in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2, of the Superseding Indictment at 15-18, filed April 21, 2016 (Doc. 367). See Plea Agreement at 2. In the Plea Agreement, Clark admits the following facts and declares them true under penalty of perjury:

> In 1998, while incarcerated with the New Mexico Department of Corrections, I became a member of the Syndicato Nuevo Mexico (SNM) prison

---

Manual does not change the result here. See U.S.S.G. § 1B1.11(b)(1). Accordingly, the Court uses the 2018 Guidelines Manual.

[2]The Court notes for the reader's convenience that Freddie Sanchez is the person identified as "F.S." throughout this Memorandum Opinion and Order.

gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2007, I was an active member of the SNM. In June of 2007, I aided and abetted Javier Alonso, a.k.a. "Wineo," Edward Troup, a.k.a. "Huero Troup," Arturo Arnulfo Garcia, a.k.a. "Shotgun," Ruben Hernandez and others to murder the person identified in the superseding indictment as F.S., who was an inmate in the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Alonso, Garcia, Troup, Hernandez, F.S. and I were members of the SNM. In March or April of 2007, a member of the SNM arrived at the SNMCF where I was incarcerated and provided me "paperwork" that was sent from Garcia. It was sent down to SNMCF because F.S. was believed to be en route to SNMCF. The "paperwork" was necessary to show that F.S. was not in good standing with the SNM, and that he needed to be killed as a result of prior cooperation with law enforcement. At the time the "paperwork" was sent to SNMCF, I was the "main enforcer" for the SNM at SNMCF. Thus, many "orders" went through me in order for them to be acted on by SNM members. On June, 17, 2007, SNM members Alonso and Troup killed F.S. in his cell, while Hernandez covered the camera lens to the camera that could have captured some of the illegal activity.

By passing the "paperwork" along to the necessary SNM gang members, I aided and abetted in the murder of F.S. as the "paperwork" was vital prior to the murder being committed. I did this because it was expected of me by virtue of my membership in the SNM gang.

Thus, in 2007, I aided and abetted the murder of F.S.

Plea Agreement at 4. By signing the Plea Agreement, Clark "agrees that the Court may rely on

any of these facts, as well as facts in the presentence report, to determine the defendant's sentence,

including, but not limited to, the advisory guideline offense level." Plea Agreement at 5.

The Presentence Investigation Report (prepared November 22, 2017, and revised August 9, 2019), filed August 9, 2019 (Doc. 2782)("PSR"),[3] expounds on the facts underlying Sanchez' murder. The PSR provides the following facts:

14. On June 17, 2007, a correctional officer with the NMCD[4] at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, was conducting formal count in one of the prison pods when he arrived at the cell belonging to inmate F.S. The officer attempted to have F.S. respond to count; however, when F.S. failed to do so, the officer entered the cell and noticed F.S.'s right hand was pale. The officer attempted to perform first aid, but found F.S.'s legs to also be pale. The officer was unable to detect a pulse. Medical personnel at the facility arrived at the pod and found F.S. lying in the prone position with his head facing to the right and with dry blood on his mouth, nose, and pillowcase.

15. Investigators with the New Mexico State Police (NMSP) were subsequently assigned to the case and made contact with correctional officers. According to one of the officers, he had an informal interview with F.S. when he arrived at SNMCF on June 14, 2007. During the informal interview, F.S. indicated he had a "hit" on him, and the correctional officers informed the Unit Manager that F.S. would need to be moved for his safety. The correctional officer stated he was surprised when he returned to work two days later and discovered F.S. had not been moved, as this process typically happened immediately.

16. On Monday, June 18, 2007, a sergeant with the NMSP Criminal Investigations Section attended F.S.'s autopsy at the Office of Medical Investigator in Albuquerque, New Mexico. The results of the autopsy and opinion of the medical examiner were that F.S. died of ligature strangulation. The autopsy revealed an abrasion almost completely encircling F.S.'s neck with a slight downward cant on the right posterior neck. The underlying neck muscles showed

---

[3]The Confidential Memorandum, filed August 9, 2019 (Doc. 2784), explains why the PSR was revised and redisclosed on August 9, 2019. The United States Probation Office ("USPO") explains that, among updating some facts -- such as Clark's age and sentencing date -- the USPO also adds two Guidelines enhancements pursuant to U.S.S.G. §§ 3A1.1(b)(1) and 3A1.3. See Confidential Memorandum at 1. The USPO advises, however, that these increases do not change Clark's total offense level, because with the increases it remains at 43. See Confidential Memorandum at 1. Clark objects to only one of these added enhancements, the vulnerable-victim enhancement under U.S.S.G. § 3A1.1(b)(1), and the Court addresses this Objection in this Memorandum Opinion and Order. See First Objections at 1; Second Objections at 2.

[4]"NMCD" is an acronym for the New Mexico Corrections Department.

hemorrhage and bruising, and the cartilage of the neck showed fractures. The manner of death was ruled a homicide.

17. On July 7, 2007, NMSP officers conducted interviews with several witnesses/suspects in the murder of F.S. Specifically, the NMSP officers spoke with Ruben Hernandez and Kyle Dwyer, who provided the following information about the murder. Hernandez indicated his primary role in the murder of F.S. was to obscure the camera lenses located in his pod prior to the murder. He was given instructions by Edward Troup, and although he initially refused, he became fearful for his life; therefore, he complied with Troup's "orders." On the evening of June 16, 2007, Hernandez was approached by Troup, who ordered him to cover the lenses immediately. Hernandez stated he placed wet paper towels over the lenses and became the "look out" for any prison staff who might enter the pod. Hernandez stated he heard F.S. struggling, gasping, and gurgling in his cell, and shortly thereafter, Raymond Rascon and Troup exited F.S.'s cell. Hernandez looked into the cell and observed Javier Alonso arranging F.S.'s body in his bed. Troup later ordered Hernandez to rearrange F.S. in his bed during the night, as this would give the appearance F.S. had moved around at some point; however, Hernandez state[d] he did not do as instructed.

18. Dwyer initially indicated he did not have any involvement in the murder of F.S. However, he later recanted and stated when he was transferred from the Penitentiary of New Mexico (PNM) in Santa Fe, New Mexico, to the SNMCF, he hand delivered a manila envelope to **Benjamin Clark, a.k.a. "Cyclone,"** who was also incarcerated at SNMCF. According to Dwyer, the envelope contained court documentation that verified F.S. had cooperated with law enforcement. Dwyer stated he had received the envelope from a correctional officer, who, in turn, had received it from Joe Martinez, an inmate at PNM. Once he arrived at SNMCF, Dwyer gave the envelope to **Clark**, whom Dwyer believed disseminated it to additional members of the SNM. A few days later, **Clark** gave the envelope back to Dwyer and stated everyone who needed to see it had seen it and instructed Dwyer to destroy the envelope, which Dwyer did. Dwyer indicated he was transferred back to PNM shortly after the murder of F.S. and was on the bus with Javier Alonso. Alonso showed Dwyer how he could position his arm to make his wrist turn pale while wearing restraints and stated that was how F.S.'s face looked when he (Alonso) was strangling him.

19. On December 3, 2015 and on March 20, 2018, special agents with the FBI met with **Clark**, who indicated he joined SNM in 1997, and renounced his membership after 2013. Regarding the 2007 murder of SNM member F.S., **Clark** stated Garcia ordered F.S.'s murder as F.S was believed to have cooperated with law enforcement. **Clark** stated it was a known rule that if an SNM member was a "rat," they were to be killed. He indicated he received the paperwork from Dwyer which he then disseminated to other SNM members including Paul Silva, Frankie

Gonzales, and Ernest Guerrero. **Clark** identified his role in the gang as an enforcer. **Clark** testified Garcia had a leadership position in the gang and was involved in drug sales, extortion, assaults, and murders. He stated upon receiving the paperwork from Dwyer, he disseminated it to other members, who then returned it to **Clark**. **Clark** then returned it to Dwyer to dispose of it. **Clark** testified he did not feel the statement F.S. gave to police was serious enough for him to be killed, but nevertheless, F.S. had a green light on him. **Clark** indicated he was not present during the killing of F.S. as he was removed from the pod due to sending correspondence to Garcia, but was later told by defendant Troup that he and defendant Javier Alonso had killed F.S. by throwing him on the floor, putting a rope around his neck, and standing on his back while slamming his head onto the floor. After F.S. was dead, Alonso picked him up and put him face down on his bunk. Jesse Trujillo, another SNM member then went into the room and cleaned the floor and flushed the rope down the toilet. Clark testified that in February 2008, he spoke to Garcia about the murder of F.S. and Garcia told him "you did good, brother" after confirming F.S. was deceased. **Clark** stated as of 2009, he had "received the keys" to run the yard for the SNM and was a top member of the SNM hierarchy. **Clark** indicated he had pushed the organization to get back to "level 3" (less restrictive) and tried to stop the killings and wars amongst the SNM members. He wanted to run the SNM just as the older members had when he first joined the criminal organization, wherein no one would take independent action against other members without due cause. **Clark** noted everything was going well in the system until Anthony Ray Baca, a.k.a. "Pup," returned from Nevada. During the time "Pup" was gone, the SNM had fewer stabbings and killings, and there was less in-fighting amongst SNM members. However, when "Pup" returned, it was said he divided the crews, and **Clark** lost control. Additionally, violence escalated, and **Clark** stated he renounced his membership to the SNM.

20. According to **Clark**, the administration at the NMCD helped to create much of the problems within the organization. He stated the administration would put known informants into the pod with other known SNM members, knowing the SNM would have to take action and kill the informants. By doing this, the SNM would have to remain on lockdown at level 4. **Clark** indicated that on several occasions, members were close to returning to level 3, but the administration would "insert a known informant" into the SNM pod, and that person was subsequently assaulted or killed. Once the killings occurred at the SNMCF, members of the SNM were placed on lockdown and limited to three showers per week, one phone call per month, and one visitor per month.

21. In regards to the 2007 murder of SNM member F.S., **Clark** stated Arturo Garcia ordered F.S.'s murder. Garcia had received paperwork on F.S. that was sent to SNM members, including **Clark**, which verified F.S. had worked with law enforcement officials. At that time, **Clark** stated he was an SNM enforcer, and Garcia had sent word to him, Frankie Gonzales, and "Ern-Dog" about F.S.'s

involvement with law enforcement. Additionally, **Clark** stated it was a known rule that if an SNM member was a "rat," they were to be killed. **Clark** denied giving anyone orders to murder F.S. On the day F.S. arrived to the unit at the SNMCF, **Clark** saw F.S. as he (**Clark**) was being moved to segregation for being accused of passing "kites" to other SNM members. **Clark** denied being in the pod when F.S. arrived and when he was killed. **Clark** identified F.S. as a friend. Once released from segregation, **Clark** informed SNM members that he did not want to know any additional information about F.S.'s murder.

22.     On August 2, 2007, Javier Alonso spoke to agents and advised that **Clark** had tasked him with making sure the hit on F.S. happened. Alonso testified and admitted his involvement in the murder of F.S. He indicated while F.S. had his back to him, he (Alonso) threw a rope around his neck, slammed him to the ground, and strangled him while Troup held his lower body. He then flushed the rope down the toilet and placed F.S. on the bed. Following the murder, Alonso indicated he and Garcia, whom he identified as a high ranking SNM member, had talked about the murder of F.S.

23.     SNM Gang member Samuel Gonzalez testified he was aware of the paperwork on F.S. that was delivered to **Clark** by Dwyer. He indicated **Clark** told him he received the paperwork from the north, specifically from Garcia, who was housed at PNM in northern New Mexico. Gonzalez testified he was aware of the paperwork on F.S. that was delivered to **Clark** by Dwyer. He indicated **Clark** told him he received the paperwork from the north, specifically from Garcia, who was housed at PNM in northern New Mexico.

24.     SNM Gang member John Montano testified that on or about June 16th or 17th of 2007, while housed at the SNMCF, **Clark** received a letter from Garcia, who was requesting a list of all SNM members housed in the SNMCF. He indicated shortly after F.S. arrived at the SNMCF, **Clark** was placed in segregation and told Troup and Alonso to make sure "that it got done." Montano indicated he knew there was paperwork on F.S. but had not personally seen it.

25.     In summary, **Clark**, a leader in the SNM organization, knew F.S. had worked with law enforcement officers and disseminated this information to additional members of the SNM when F.S. arrived at the SNMCF. Shortly after this information was disseminated, F.S. was murdered at the facility. Based on the facts of this case, while incarcerated at the SNMCF, two SNM Gang members entered F.S.'s cell and slammed his face on the ground, [and F.S.]was restrained while he was strangled to death with a rope. Due to the close quarters in F.S.'s cell, which had only one entrance/exit, he was not able to fight off his assailants or escape. Thus, F.S. was restrained and can be identified as a vulnerable victim. Furthermore, on May 15, 2019, Judge Browning addressed the Vulnerable Victim enhancement and made a ruling regarding the application of U.S.S.G. §3A1.1(b),

*U.S. v. Edward Troup* case. Specifically, the United States Probation Office applied this two-level increase, as it is supported by circuit case law. In U.S. v. Tapia (59 F.3d 1137), the Eleventh Circuit Court found that the victim was "particularly vulnerable by virtue of his incarceration with appellants and his inability to escape, and that the victim was targeted because of this vulnerability." Furthermore, in U.S. v. Lambright (320 F. 3d 517 -- Fifth Circuit) "the District Court based its conclusion that the victim was vulnerable on the findings that he was completely dependent upon the care of the correction officers, that he was locked in his cell prior to the assault, and that he could not protect himself from the assault." The Court found that this increase was appropriate as it was well known that F.C., a member of the SNM gang, had a "green light," which meant he was to be killed. Based on **Clark's** leadership role in the SNM Gang and that fact he disseminated the orders to murder of F.S., his role can be assessed as aggravating.

PSR ¶¶ 14-25, at 8-12. As to these facts, Clark objects to only paragraph 22, because Clark maintains that he never tasked Alonso with Sanchez' hit. <u>See</u> First Objections at 1; Second Objections ¶ 1, at 1.

Clark first objects to the United States Probation Office's ("USPO") application of U.S.S.G. § 3A1.3, asserting that "the victim was no more or no less vulnerable than any other inmate." First Objections at 1. The Addendum to the Presentence Report, filed August 23, 2019 (Doc. 2824)("Addendum"), explains that the PSR's paragraph 25 provides justification for this enhancement, because the Court found the enhancement applicable when calculating Troup's Guidelines sentence for Sanchez' death. <u>See</u> Addendum at 1 (citing PSR ¶ 25, at 11). Clark responds, however, that Sanchez "was himself, a murderer," and "taught Mr. Clark, among other things, how to make shanks, how to make ropes to strangle and how to locate 'kill points' on the human body." Second Objections ¶ 4, at 2 (internal quotations for emphasis, not for quotation).

The 2-level vulnerable-victim enhancement applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known

of the victim's unusual vulnerability."  U.S.S.G. § 3A1.1 Application Note 2.  The United States

Court of Appeals for the Tenth Circuit has explained that the adjustment applies where "the victim

is *unusually* vulnerable or *particularly susceptible* to the crime committed," and where the victims

"are unable to protect themselves [and] therefore require greater societal protection."  United

States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original).  The Tenth Circuit

requires the sentencing court to "make an individualized determination; it is not enough that a

victim belongs to a class generally considered vulnerable."  United States v. Scott, 529 F.3d 1290,

1300-01 (10th Cir. 2008)(citing United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002);

United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997)).  Further, in addition to the

"particularized evidence of a victim's vulnerability, . . . the evidence must also distinguish the

victim as atypical of the usual targets of the relevant criminal conduct."  United States v. Caballero,

177 F.3d 1235, 1251 (10th Cir. 2002)(citing United States v. Creech, 913 F.2d 780, 782 (10th Cir.

1990)).

     In the prison context specifically, the United States Court of Appeals for the Eleventh

Circuit, in United States v. Tapia, 59 F.3d 1137 (11th Cir. 1995), reviewed the district court's

decision that an incarcerated government informant, whom other prisoners assaulted, was a

vulnerable victim for U.S.S.G. § 3A1.1's purposes.  See 59 F.3d at 1143.  The Eleventh Circuit

concluded that the district court did not err in applying the enhancement to the appellants'

convictions under 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant),

determining that the district court "correctly concluded that [the victim], as an individual, was

particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape,

and that [the victim] was targeted because of this vulnerability."  United States v. Tapia, 59 F.3d

at 1143. In <u>United States v. Lambright</u>, 320 F.3d 517 (5th Cir. 2003), the United States Court of Appeals for the Fifth Circuit also upheld a U.S.S.G. § 3A1.1 enhancement, where a corrections officer killed an inmate. <u>See</u> 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers, . . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault." 20 F.3d at 518.

Here, the Plea Agreement, the PSR, and the trial testimony establish by a preponderance of the evidence that Sanchez was particularly susceptible to being murdered and unable to protect himself. <u>See</u> <u>United States v. Proffit</u>, 304 F.3d at 1007. First, Clark provides in his Plea Agreement that he received paperwork "necessary to show that F.S. was not in good standing with the SNM, and that he needed to be killed as a result of his prior cooperation with law enforcement." Plea Agreement at 4. The PSR states that Sanchez knew there was a hit on him and told a correctional officer, so he would be moved outside of the SNM-filled pod, but that he was not moved. <u>See</u> PSR ¶ 15, at 8-9. The Court notes that this fact indicates that Sanchez tried to protect himself and failed. The PSR further provides that SNM members with which Sanchez lived killed Sanchez, because of the paperwork and the hit on Sanchez, and that the SNM members knew of the paperwork and the hit on Sanchez. <u>See</u>, <u>e.g.</u>, PSR ¶¶ 17, 19-23, at 9-11.

Trial testimony also supports these facts. SNM members testified that, because the SNM prohibits snitching -- or talking with law enforcement, the SNM kills those members who break this rule. <u>See</u> Transcript of Excerpt of Testimony of Leonard Lujan at 12:16-23 (taken April 23-24, 2018)(Beck, Lujan), filed May 16, 2018 (Doc. 2282)("Lujan Tr.")(stating that "the biggest" SNM rule is "don't snitch" and that those who do are "going to get hit"); <u>id.</u> at 73:10-12 (Beck,

Lujan)(stating that being a rat gets "an automatic green light"); Transcript of Excerpt of Testimony of Manuel Jacob Armijo at 178:2-3 (taken April 26-27, 2018)(Sindel, M. Armijo), filed May 16, 2018 (Doc. 2284)("M. Armijo Tr.")(stating that those who talk to the police can get hit). Clark testified that Sanchez cooperated with law enforcement. See Transcript of Excerpted Testimony of Benjamin Clark at 49:22-50:1 (taken May 4, 2018)(Beck, Clark), filed May 23, 2018 (Doc. 2307)(stating that Sanchez cooperated with law enforcement). See also Transcript of Excerpt of Testimony of Billy Cordova at 34:1-2 (taken May 9-10, 2018)(Cordova), filed May 23, 2018 (Doc. 2312)("Cordova Tr.")(stating that Sanchez was a rat). Accordingly, that SNM members knew Sanchez snitched made him particularly vulnerable to being murdered, especially because, if he was not killed, those tasked with killing him would be killed. See Lujan Tr. at 415:22-24 (Lujan)("If you didn't do it [(follow orders)], then you were going to be the one greenlighted[.]"); M. Armijo Tr. at 184:12-16 (Sindel, M. Armijo)(stating that it is SNM's rule to kill informants, and those who do not kill informants are subject to a hit). Alonso and Troup targeted Sanchez specifically because of the green light on him, and because of the threat to their own lives if they did not follow through with it. See Transcript of Excerpted Testimony of Javier Alonso at 29:24-30:3 (taken May 7, 2018)(Alonso), filed May 23, 2018 (Doc. 2310)("Alonso Tr.")(stating that, after seeing Sanchez' paperwork and before Sanchez moved to their pod, Alonso and Troup discussed how to complete the hit on Sanchez if he moved to their pod); id. at 36:14-21 (Alonso)(providing that Guerrero wanted Alonso to make sure the hit got done and that the Rascon brothers "took care of what they were supposed to do"); id. at 40:23-41:2 (Alonso)(stating that Guerrero said: "Make sure it gets done, or we're going to come in here and get you guys and take you guys out."); id. at 41:9-17 (Beck, Alonso)(stating that, in response to that threat, Alonso

met Troup and told him: "It's going down," meaning they were going to kill Sanchez "like right now"); United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992)(stating that U.S.S.G. § 3A1.1(b)(1) is justified where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics"). That Sanchez was incarcerated in the same pod as SNM members who knew Sanchez snitched, were ordered to act on it, and had easy access to him increased Sanchez' vulnerability to being murdered -- which Cordova's prior, failed attempt to murder Sanchez underscores. See, e.g., Cordova Tr. at 347:3-15 (Castellano, Cordova)(stating that, upon learning Sanchez snitched, Cordova attempted to stab him); Transcript of Excerpt of Testimony of Raymond Rascon at 10:14-24 (May 9, 2018)(Beck, Rascon), filed May 23, 2018 (Doc. 2311)(stating that Troup and Alonso told him to kill Sanchez); Alonso Tr. at 27:3-11 (Beck, Alonso)(stating that Sanchez' paperwork was passed through the pod, which is "[e]ssentially a death sentence," because of the prohibition on snitching); id. at 27:126-18 (Beck, Alonso)(stating that Sanchez did not live in 1-AB pod when Alonso saw his paperwork, but later moved into that pod); id. at 50:1-8 (Beck, Alonso)(providing that Troup and Alonso were housed in 1-AB pod). Troup and Alonso murdered Sanchez in his cell, with Troup distracting Sanchez so Alonso could jump on him from behind, which hampered Sanchez' ability to defend himself or escape. See Alonso Tr. at 42:12-43:19 (Alonso, Beck). The Court therefore determines by a preponderance of the evidence that Sanchez was vulnerable because of the SNM hit on him, because of his incarceration with other SNM members who were ordered to act on the hit, and because of his limited ability to defend himself or escape from the surprise attack in his cell. Although Clark was not privy to the plan of attack, he saw Sanchez' paperwork and passed it to other SNM members knowing it would lead to Sanchez' death, so the Court concludes that Clark knew or should have

known of Sanchez' particular susceptibility to being killed.  Accordingly, the Court will apply the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1), and overrules Clark's Objection.

Clark's second, and final, Objection is to the USPO's application of U.S.S.G. § 3B1.1(c), arguing that "Clark's role was merely as a conduit in passing along a kite that he neither generated nor endorsed."  First Objections at 1. Clark also notes that, in the Plea Agreement, he "admits to aiding and abetting, rather than planning or directing the murder."  First Objections at 1.  The PSR provides, in relevant part, "[b]ased on **Clark's** leadership role in the SNM Gang and the fact he disseminated the orders to murder F.S., his role can be assessed as aggravating."  PSR ¶ 25, at 12.

U.S.S.G. § 3B1.1 provides for enhancements to a defendant's offense level based on the defendant having played an aggravating role in the offense.  U.S.S.G. § 3B1.1 states:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> > (a) If the defendant was an organizer or leader of the criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
> >
> > (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
> >
> > (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1 (bold in original).  The Guidelines define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Application Note 1.  Further, the Guidelines counsel:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority over others.  There can, of

course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1 Application Note 4. "[A]ll persons involved during the course of offense are to be considered" in assessing the extensiveness of the criminal organization, U.S.S.G. § 3B1.1 Application Note 3, and the United States Sentencing Commission ("Commission") intends "that this adjustment . . . increase with both the size of the organization and the degree of the defendant's responsibility," U.S.S.G. § 3B1.1 Background. Accordingly, the Tenth Circuit and the Court have recognized that U.S.S.G. § 3B1.1(c) applies to a defendant leader, organizer, supervisor, or manager where the criminal activity has less than five people or is not otherwise extensive. See United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009); United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.).

Here, Clark admits that he passed the Sanchez paperwork "to the necessary SNM gang members," that the "'paperwork' was necessary to show that F.S. was not in good standing with the SNM" and "was vital prior to the murder being committed," and that he "was 'the main enforcer' for the SNM" at Southern New Mexico. Plea Agreement at 4 (internal quotations for emphasis, not for quotation). The Tenth Circuit has written: "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (internal citations omitted). Clark admitted that he exercised control over his fellow SNM members incarcerated at Southern New Mexico, see Plea Agreement at 4, and that he knew, when he passed the paperwork to other SNM members, that Sanchez was sentenced to death, see Transcript of Excerpt of Testimony of Benjamin Clark at 45:21-46:6 (taken May 4, 2018)(Beck,

Clark), filed May 23, 2018 (Doc. 2307); id. at 48:11-17 (Beck, Clark). The Court therefore concludes that Clark not only exercised some degree of control over the SNM members with whom he was incarcerated, but that he also played a substantial role in organizing Sanchez' murder by sharing the paperwork which established Sanchez' snitching and instituted the green light. See United States v. Valdez-Arieta, 127 F.3d 1267, 1270 (10th Cir. 1997)(upholding district court's application of U.S.S.G. § 3B1.1(c) based on its conclusion that the defendant "played 'a substantial role in organizing' the criminal activity" (source of quote not provided)). Sanchez' murder involves at least five participants, as the Superseding Indictment charges five men with his murder, and all either pled guilty or were found guilty at trial. See Superseding Indictment at 15 (charging Alonso, Troup, Garcia, Clark, and Hernandez with Sanchez' murder); Plea Agreement at 2, filed August 28, 2017 (Doc. 1237)(Alonso's guilty plea as to Sanchez' murder); Verdict at 3-4, filed May 25, 2018 (Doc. 2332)(finding Troup and Garcia guilty of Sanchez' murder); Plea Agreement at 2 (Clark's guilty plea as to Sanchez' murder); Plea Agreement at 2, filed February 1, 2017 (Doc. 880)(Hernandez' guilty plea as to Sanchez' murder). Further, the SNM is an extensive criminal organization, and the Court concludes that this case is one for which the Commission created U.S.S.G. § 3B1.1(a). See U.S.S.G. § 3B1.1 Background. Accordingly, the Court will overrule Clark's Objection and, rather than apply U.S.S.G. § 3B1.1(c) as the USPO does, will apply U.S.S.G. § 3B1.1(a)'s 4-level enhancement, because of the number of participants in Sanchez' murder. The Court notes that even with this 4-level enhancement, Clark's total offense level remains at 43. See U.S.S.G. Chapter 5, Part A Application Note 2.

IT IS ORDERED that: (i) the Defendant's Formal Objections to Presentence Report, filed August 22, 2019 (Doc. 2817), are overruled; and (ii) the objection to the United States Sentencing

Guidelines Manual sentence calculations in the Second Notice of Formal Objections to Presentence Report, filed August 24, 2019 (Doc. 2825), is overruled.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

       *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

       *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

       *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias Attorney at Law
Albuquerque, New Mexico

*Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

      *Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

      *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

      *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

      *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

*Attorneys for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

*Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*